**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**

| | |
|---|---|
| 3SHAPE A/S<br><br>Plaintiff,<br><br>v.<br><br>CARESTREAM DENTAL, LLC,<br><br>DENTAL IMAGING TECHNOLOGIES CORP., and DENTAL IMAGING TECHNOLOGIES CORP. d/b/a DEXIS<br><br>Defendants. | C.A. No. 1:22-cv-01829-WMR |

**PLAINTIFF 3SHAPE A/S'**
**RESPONSIVE BRIEF ON CLAIM CONSTRUCTION**

# TABLE OF CONTENTS


I. Introduction .....2

II. U.S. Patent Nos. 11,076,146 and 11,368,667 .....2
- A. "a pattern generator configured to generate, using a light source, a probe light with a plurality of configurations in the form of a time-varying illumination pattern" ('146: cl. 1; '667: cls. 1, 14, 26).....2
  - 1. *"Pattern generator" does not invoke §112(6).* .....2
  - 2. *Each structure disclosed in the specification is explicitly linked to the claimed function.*.....5
- B. "a time-varying illumination pattern" ('146: cls. 1, 13, 15, 21, 27, 29; '667: cls. 1, 14, 26) .....9
- C. "wherein the intraoral scanner is wireless" ('146: cl. 1; '667: cls. 1, 14, 29) .....11
- D. "optical path" ('146: cls. 1, 21; '667: cls. 1, 14, 26) .....12
- E. "high-speed camera" ('146: cls. 1, 6, 22) .....14
- F. "switching on and off the at least three monochromatic light sources" ('146: cl. 6; '667: cls. 3, 20).....16
- G. "wherein the probe light is directed towards the object in a direction substantially parallel with the longitudinal axis of the tip" ('146: cl. 8) / [similar language] ('667: cls. 5, 22).....18
- H. "data for the 3D geometry" ('146: cls. 12, 24; '667: cls. 8, 15) / "the data for the 3D geometry" ('146: cl. 21).....19

III. U.S. Patent No. RE48,221.....21
- A. "physical 3D environment" (cls. 1, 19, 33) .....21
- B. "wherein the at least one motion sensor is a sensor that directly detects motion" (cls. 1, 19) .....22

IV. U.S. Patent No. 10,695,151 .....25
- A. "shape data" (cls. 1, 13, 14) / "texture data" (cls. 1-3, 7, 10, 13-15)..25
- B. "deriving a certainty score" (claim 1).....26
- C. Antecedent Basis Terms.....27

V. Conclusion.....30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3M Co. v. Kerr Corp.*,
No. 17-1730-LPS, 2019 WL 2411736 (D. Del. June 7, 2019) (Stark, J.)..........22

*Advanced Ground Sys., Inc. v. Life360, Inc.*,
830 F.3d 1341 (Fed. Cir. 2016)..........4

*Apple, Inc. v. Motorola, Inc.*,
757 F.3d 1286 (Fed. Cir. 2014)..........3

*BASF Corp. v. Johnson Matthey Inc.*,
875 F.3d 1360 (Fed. Cir. 2017)..........30

*Blue Calypso, LLC v. Groupon, Inc.*,
815 F.3d 1331 (Fed. Cir. 2016)..........23

*D.M.I, Inc. v. Deere & Co.*,
755 F.2d 1570 (Fed. Cir. 1985)..........8

*Data Engine Techs. LLC v. Google LLC*,
10 F.4th 1375 (Fed. Cir. 2021)..........28

*Datatreasury Corp. v. Ingenico S.A.*,
Case No. 5:02-cv-00124, 2003 WL 25832277 (E.D. Tex. Aug 19, 2003)..........4

*Enzo Biochem, Inc. v. Applera Corp.*,
599 F.3d 1325 (Fed. Cir. 2010)..........18

*Epic Tech, LLC v. Penn-Tech Assocs., Inc.*,
Case No. 1:20-cv-02428, 2022 WL 3212728 (N.D. Ga. Jun. 3, 2022)..........20

*FloodBreak, LLC v. Art Metal Industries, LLC*,
No. 3:18-cv-503, 2020 WL 45458084 (D. Conn. Aug. 6, 2020)..........23

*Harmonic Design, Inc. v. Hunter Douglas, Inc.*,
88 F.Supp.2d 1102 (C.D. Cal. 2000)..........3

*Kason Inds., Inc. v. Component Hardware, Grp., Inc.*,
No. 3:13-cv-00012, 2014 WL 10588312 (N.D. Ga. Jan. 31, 2014)....................26

*Lawther v. Hamilton*,
124 U.S. 1 (1888) ........................................................................................8

*Maxell Ltd. v. Apple Inc.*,
Case No. 5:19-cv-00036, 2020 WL 10456875 (E.D. Tex. Mar. 18, 2020) .....3, 4

*Microsoft Corp. v. i4i Ltd. P'ship*,
564 US 91 (2011) ........................................................................................22

*Mobile Telecomms. Techs., LLC v. United Parcel Service, Inc.*,
No. 12-cv-3222, 2014 WL 1274003 (N.D. Ga. Mar. 17, 2014).........................27

*Nervo Corp. v. Boston Scientific Corp.*,
955 F.3d 35 (Fed. Cir. 2020) ........................................................................11

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
521 F.3d 1351 (Fed. Cir. 2008) ....................................................................26

*Paragon Solutions, LLC v. Timex Corp.*,
566 F.3d 1075 (Fed. Cir. 2009) ....................................................................17

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2006) (en banc) ...............................................14, 17

*Power Mosfet Techs. LLC v. Siemens AG*,
378 F.3d 1396 (Fed. Cir. 2004) ....................................................................13

*Shire Development LLC v. Teva Pharms. USA, Inc.*,
Case No. 1:17-cv-01696, 2019 WL 969638 (D. Del. Feb. 28, 2019)................10

*Verve, LLC v. Crane Cams, Inc.*,
311 F.3d 1116 (Fed. Cir. 2002) ....................................................................18

*Williamson v. Google*,
No. 15-cv-00966, 2017 WL 3232582 (N.D. Cal. July 27, 2017).......................30

# EXHIBITS[1]

| **Exhibit** | **Description** |
|---|---|
| A* | 2019-05-29 Final Written Decision for Case IPR2018-00197 |
| B* | 2018-08-20 Patent Owner's Response to the Petition for *Inter Partes Review* for U.S. Patent No. 9,329,675 |
| C* | Excerpt of File History for U.S. RE48,221 |
| D* | 2023-01-30 Declaration of Dr. Xiong |
| E* | FastCam BC2 HD: High Speed Camera System for Broadcast Application |
| F* | Fastec Imaging: High Speed Imaging in the Palm of Your Hand |
| G* | Vision Search Phantom Flex Data Sheet (Rev Oct. 2010) |
| H* | Excerpt of Microsoft Computer Dictionary, Fifth Edition |
| I | 2023-02-16 Declaration of Dr. Xiong |
| J | 2022-12-19 Petition for *Inter Partes* Review filed in IPR2023-00387 (Excerpt) |
| K | 2022-12-23 Petition for *Inter Partes* Review filed in IPR2023-00411 (Excerpt) |
| L | 12-21-2022 Petition for *Inter Partes* Review filed in IPR2023-00400 (Excerpt) |

[1] Exhibits A-H were previously filed with 3Shape's Opening Claim Construction Brief on January 30, 2023 (Def. Br., 156-1 through Def. Br., 156-8).

# TABLE OF ABBREVIATIONS

| Abbreviation | Description |
|---|---|
| ’221 Patent | U.S. Patent No. RE48,221 |
| ’151 Patent | U.S. Patent No. 10,695,151 |
| ’146 Patent | U.S. Patent No. 11,076,146 |
| ’667 Patent | U.S. Patent No. 11,368,667 |
| ’675 Patent | U.S. Patent No. 9,329,675 |
| 2D | Two-dimensional |
| 3D | Three-dimensional |
| 3Shape | Plaintiff 3Shape A/S |
| Asserted Patents | U.S. Patent Nos. RE48,221, 10,695,151, 11,076,146, and 11,368,667 |
| Def. Br. | Defendants’ Opening Claim Construction Brief |
| Defendants | Carestream Dental, LLC, Dental Imaging Technologies Corp., Dental Imaging Technologies Corp. d/b/a DEXIS |
| IPR | *Inter partes* review |
| POSITA | Person of ordinary skill in the art |
| PTAB | Patent Trials and Appeals Board |

# I. INTRODUCTION

3Shape's proposed constructions either allow the plain language of the claims to dictate their well-understood meaning or provide clarifications consistent with their plain meaning. In contrast, Defendants seek to introduce ambiguity or narrow claim scope to the exclusion of disclosed embodiments to manufacture non-infringement positions. Defendants' positions here starkly contrast with their parallel IPR petitions, where Defendants asserted "no construction was necessary" for any claim term across all four patents.

Moreover, Defendants' indefiniteness accusations here fall flat in light of their IPR petitions, which provided no explanation or context regarding any of the purportedly indefinite terms and instead simply directly mapped elements in the alleged prior art to the claims. 3Shape's constructions are consistent with the specifications and are based on how a POSITA would understand the meaning of these claims. 3Shape's proposed constructions should be adopted.

# II. U.S. PATENT NOS. 11,076,146 AND 11,368,667

## A. "a pattern generator configured to generate, using a light source, a probe light with a plurality of configurations in the form of a time-varying illumination pattern" ('146: cl. 1; '667: cls. 1, 14, 26)

### 1. *"Pattern generator" does not invoke §112(6).*

Defendants cannot overcome the presumption that "pattern generator" is not subject to §112(6) as it connotes sufficiently definite structure to a POSITA, particularly as read in light of the claims and specification. *Apple, Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1299 (Fed. Cir. 2014) ("A limitation has sufficient structure [to not invoke § 112(6)] when it recites a claim term with a structural definition that is either provided in the specification or generally known in the art.") The claims recite a "pattern generator configured to generate, using a light source, a probe light with a plurality of configurations in the form of a time-varying pattern." '146 Patent, cl. 1; '667 Patent, cls. 1, 14, 26. That "pattern generator" connotes sufficiently definite structure is confirmed by the specification, which provides numerous structural embodiments of the pattern generator. *See id.*, 8:10-57, 13:14-38, 28:5-13. A POSITA would readily understand from the plain language of the claims the class of structures connoted by "pattern generator." Ex. I, ¶¶7-10

Indeed, where the surrounding claim language and specification provide "detail as to how the [generator term] interacts with other components of the claimed invention" district courts have consistently found that claiming a "generator" term does not invoke § 112(6). *See Maxell Ltd. v. Apple Inc.*, Case No. 5:19-cv-00036, 2020 WL 10456875 at *13 (E.D. Tex. Mar. 18, 2020); *see also*

*Harmonic Design, Inc. v. Hunter Douglas, Inc*., 88 F.Supp.2d 1102, 1105 (C.D. Cal. 2000) (finding "control signal generator" to connote sufficient structure where the claim language and specification identified the location of the "control signal generator" within the invention); *Datatreasury Corp. v. Ingenico S.A.*, Case No. 5:02-cv-00124, 2003 WL 25832277, at *23-24 (E.D. Tex. Aug 19, 2003) (finding "report generator," in the context of the specification, provided sufficiently definite structure to avoid §112(6)).

Defendants' reliance on *Advanced Ground Info Systems* is misplaced because the claims recited a "symbol generator" to "generate symbols" with no further description to provide context, connection, or interaction with the other recited components of the invention. *See Advanced Ground Sys., Inc. v. Life360, Inc.*, 830 F.3d 1341, 1346 (Fed. Cir. 2016). In contrast, where claim language connects the claim term to structure and corresponding descriptions in the specification, means-plus-function interpretation is not necessary or appropriate. *See, e.g., Maxell*, 2020 WL 10456875 at *13-14 ("ringing sound generator" does not invoke § 112(6) because of claimed structure connecting it to its sources, controller, and output and the described class of structures in the specification) (citing *Personalized Media Commc'ns, LLC v. ITC*, 161 F.3d. 696, 705 (Fed. Cir. 1998) ("even though the term 'detector' does not specifically evoke a particular

structure, it does convey to one knowledgeable in the art a variety of structures known as 'detectors'")).

Unlike the "symbol generator" in *Advanced Ground Info Systems*, the "pattern generator" claimed in the '146 and '667 Patents is described in terms of its inputs, outputs, and interaction with other claimed elements. *See* '146 Patent, cls. 1, 21 (describing the light source input, time varying illumination pattern output, and optical system configured for transmitting and receiving the resulting pattern); '667 Patent, cls. 1, 14, 26 (same). Moreover, the specification describes a class of structures (*e.g.*, LCD or DLP projector, controlled array of LEDs, etc.) used to generate the pattern. *See, e.g.,* '146 Patent, 8:10-57; 13:14-38; 28:5-13.

Finally, Defendants' argument that the specification's use of the term "pattern generation means" supports finding "pattern generator" invokes §112(6) is inapposite. The claims here are drafted without the word "means," highlighting the patentee's intent to *not* invoke §112(6). Nothing about the specification's reference to a "pattern generation means" takes away from the structural description provided in the claims and specification. Nor does it take away what a POSITA would understand the "pattern generator" to connote. Ex. I, ¶¶11-12.

**2. *Each structure disclosed in the specification is explicitly linked to the claimed function.***

Defendants acknowledge that the specification lists out several structures

that they exclude from their §112(6) construction. Defendants claim that this is because the specification does not link the structure clearly enough to the function. Def. Br., 4. Defendants' arguments are internally inconsistent and contradicted by governing case law.

A POSITA would understand that each of the embodiments listed in the specification are clearly linked to and could be used to perform the claimed function. Ex. I, ¶13. Defendants' first argument is that "at least one translucent and/or transparent pattern element with a motor" should be excluded because it "omits an opaque mask" from the function. Def. Br., 5 (citing '146 Patent, 8:38-45). The passage Defendants rely upon, however, makes clear that the use of an opaque mask is optional, specifying that "an opaque mask ***can*** be used" to "generate[] a time varying pattern" with "at least one translucent and/or transparent pattern element." '146 Patent, 8:38-45.[2] Nothing in the specification states that the use of an opaque mask is the only way to generate a time varying pattern or that it ***must*** be used with the translucent and/or transparent pattern element. Defendants' expert likewise does not make such a claim. Def. Br., Ex. 1 ¶ 36. To the contrary, a motor with a "translucent and/or transparent pattern element" can

---

[2] All emphasis is added in quotations unless noted otherwise.

sufficiently, on its own, generate a time varying illumination pattern. Ex. I, ¶15. Pattern elements with variations in the degree of translucency, or a combination of translucent and transparent sections, could perform the claimed function, even without an opaque mask element. *Id.*, ¶¶14-15.

Defendants' second argument is that "a glass plate with an opaque mask with a motor" would only generate a static pattern. Def. Br., 5. Defendants are incorrect. The specification actually says: "[f]or generating a static pattern a glass plate with an opaque mask can be used." '146 Patent, 8:46-48 (*i.e.*, no mention here of a "motor"). The specification then goes on to say that the "time varying pattern can be generated by ***rotating*** and/or ***translating*** the pattern element." *Id.*, 8:54-55. This is why the identified structure is "a glass plate with an opaque mask ***with a motor***"; *i.e.*, the *motor* in conjunction with components that form a static pattern are collectively able to generate a probe light with a time-varying illumination pattern. Further, a POSITA would understand that this apparatus would work much the same way as the translucent and/or transparent pattern element with a motor. Ex. I, ¶¶16-19.

Defendants' third argument relies on the specification's use of "varying" rather than "time-varying" to argue that the "Ronchi ruling" and "LCD or DLP based projector" embodiments are not linked to the function of generating a time-

varying illumination pattern. The best Defendants can muster is a claim that the reference to "varying illumination pattern…does not *necessarily* relate to a time-varying pattern." Def. Br., 6. But Defendants admit that "varying" as used in the specification includes both time and spatial variation. *Id*. Defendants' own citation explains that the "varying illumination pattern … generated by an LCD or DLP based projector" (or by a Ronchi ruling) may be either spatially varying or time varying. Def. Br., 6 (quoting '146 Patent, 3:11-14 ("The variation/oscillation in the pattern may be spatial, *e.g.*, a static checkerboard pattern, and/or it may be time varying, for example by moving a pattern across the object being scanned.")). Accordingly, the structures identified in 3Shape's alternative §112(6) construction are sufficiently linked to the claimed "pattern generator."

Defendants also appear to take issue with the description of the Ronchi ruling with a motor and LCD or DLP based projector by claiming the description of these embodiments is too short. But there is no requirement that the specification teach what is already known in the art. *See, e.g.*, *Lawther v. Hamilton*, 124 U.S. 1, 9 (1888) ("These several steps being well known in the art when the patent was applied for, required no particular explanation."); *see also, e.g.*, *D.M.I, Inc. v. Deere & Co.*, 755 F.2d 1570, 1574 (Fed. Cir. 1985) ("there is and can be no requirement that applications describe or predict every possible

means for accomplishing that function"). A POSITA would understand that a Ronchi ruling, placed in the path of the probe light, is manipulable by a motor to generate the claimed time-varying illumination pattern. Ex. I, ¶¶ 20-21; *see also*, '146 Patent, 13:29-31. Likewise, a POSITA would understand that both LCD and DLP based projectors turn on and off pixels in an array of pixels to create time varying illumination patterns. Ex. I, ¶¶22-27. A POSITA would understand how to use either an LCD or DLP based projector to generate a time-varying illumination pattern. '146 Patent, 13:37-38; *see also* Ex. I, ¶¶22-27.

Accordingly, because: (i) the specification clearly links each of the recited structures to the claimed function, and (ii) a POSITA would understand how each embodiment performs the claimed function, each of 3Shape's identified structures in its alternative §112(6) construction should be included.

### B. "a time-varying illumination pattern" ('146: cls. 1, 13, 15, 21, 27, 29; '667: cls. 1, 14, 26)

Defendants claim that their proposed construction "tracks the definition provided in the Definition section of the common specification verbatim." Def. Br., 7. This is not correct. Defendants rely on the definition of "[t]ime varying pattern." Def. Br., 7 (quoting '146 Patent at 4:63-65). But the term at issue here is "time-varying ***illumination*** pattern." Defendants' construction would improperly read out the claims' recitation of "illumination."

Defendants improperly seek to construe the term from a single sentence in the specification without regard to the context of the other portions of the specification (and claims). Courts have recognized this is improper. *See, e.g.*, *Shire Development LLC v. Teva Pharms. USA, Inc.*, Case No. 1:17-cv-01696, 2019 WL 969638 at *9-10 (D. Del. Feb. 28, 2019) (rejecting an attempt to limit a construction to a single sentence in a definition section, and instead including surrounding context). Here, under a "Definitions" heading, the specification defines "pattern" as "a light signal comprising an embedded spatial structure in the lateral plane," and then defines "time varying pattern" as "a pattern that varies in time; i.e. *the* embedded spatial structure varies in time." '146 Patent, 4:59-63. This definition shows the embedded spatial structure is part of *the light signal*. It explicitly says the light signal "comprises" the embedded spatial structure. The addition of the word "illumination" in the actual claim term confirms that the construction must capture the light signal. And, in the context of all independent claims where this term appears, the "light signal" is the probe light. *See* '146 Patent, cls. 1, 21; '667 Patent, cls. 1, 14, 26.

This is also consistent with how a POSITA reading this term in the full context of the specification and the independent claims—rather than reading one sentence in isolation as Defendants propose—would have understood that what

varies in time is an embedded spatial structure *of the probe light*. *See* Ex. D, ¶¶28-31. There is no "confusion" created by 3Shape's proposal as Defendants allege (Def. Br., 7); the embedded spatial structure is what varies in time and "of the probe light" provides proper context for what the embedded spatial structure is, *i.e.*, it is a spatial structure in a light signal (the probe light) as defined in the specification. '146 Patent, 4:59-60.

### C. "wherein the intraoral scanner is wireless" ('146: cl. 1; '667: cls. 1, 14, 29)

The term "wireless" is not indefinite. It is a commonly used term understood by those of skill in the art. Defendants' argument, to the extent it has any basis, appears to be a misunderstanding of the law and specification. Defendants argue it is unclear "what aspect of the intraoral scanner must be wireless." Def. Br., 8. If the claim intended to limit the meaning of "wireless" to a particular aspect, it would have done so. That such a limitation is not specified, means that the plain and ordinary meaning of "wireless" applies and, if the accused scanner meets that definition, it infringes. *Nervo Corp. v. Boston Scientific Corp.*, 955 F.3d 35, 39 (Fed. Cir. 2020) (finding claims are not indefinite where infringement must be determined on a case-by-case basis).

Defendants' indefiniteness argument appears to be wholly based on a misreading of the relevant passage from the specification, which provides two

examples. Def. Br., 8. Again, if the claims intended to select between these two examples or otherwise limit the meaning of "wireless" to only specific functions, it would have done so. That the claims do not specify, means that either example given in the specification would satisfy the "wireless" limitation, as would other commonly understood and well-known ways a device can be wireless. Indeed, Defendants' own IPR challenges did not raise any construction issues with respect to "wireless" nor appear to have any difficulty mapping elements in the alleged prior art to the claims. *See* Ex. J, 2-7, 11; *see also* Ex. K, 2-7, 10, 13.

Accordingly, the "wireless" term should be given its plain and ordinary meaning: a scanner capable of operating without a wired connection. While operating without a wired connection may encompass multiple embodiments – scanners Defendants describe as both cordless and capable of transmitting data wirelessly, *e.g.*, with an internal power source, such as a battery – the claim's scope does not render it indefinite.

**D. "optical path" ('146: cls. 1, 21; '667: cls. 1, 14, 26)**

The most important context for this dispute is what the claims *already define*. Defendants' attempt to manufacture a non-infringement argument by re-defining the transmission path of the light (in a manner inconsistent with what the claims already recite) should be rejected.

All five of these independent claims recite "transmit[ting] the probe light towards the object along the optical path" and separately recite "transmit[ting] the probe light back to the camera" (without mentioning the term "optical path" in the latter recitation). *See* '146 Patent, cls. 1, 21; '667 Patent, cls. 1, 14, 26. Defendants' proposed construction thus injects ambiguity because it is unclear whether multiple probe light transmissions to the camera are now required (contrary to the plain language of the claims or any embodiment in the specification), and if not, Defendants' construction is improper because it renders the second "transmit[ting]" element superfluous. *See, e.g., Power Mosfet Techs. LLC v. Siemens AG*, 378 F.3d 1396, 1410 (Fed. Cir. 2004).

Defendants allege that patentee "defined" this term at column 27 lines 51-53 of the '146 Patent. Def. Br., 9. This is wrong. The specification defines "optical path" in a definition section in column 5. '146 Patent, 5:32-33. Regardless, no definition need be imported into the claims here because, as explained above and in the opening brief, the claims ***already define*** the light transmission paths.

Defendants' suggestion that the optical path of the light transmission to the camera must be *the same* as the optical path of the light transmission to the object (Def. Br., 10), is not captured even under their proposed construction, let alone the actual claim language. Further, the specification illustrates an embodiment where

the optical path of the light transmission from the object to the camera is not the same as the optical path for the transmission from the light source to the object. *See* '146 Patent, FIG. 2 (showing different optical paths); Ex. I, ¶¶ 37-40 (explaining same). The specification also explains different embodiments can utilize different optical systems and/or optical axes for transmitting the probe light towards the object and from the object to the camera. *See* '146 Patent, 3:25-29, 5:24-27 ("[t]here may be more than one optical axis"). Any descriptions regarding use of the "same" optical axis are clearly only referring to exemplary embodiments. *See, e.g., id.*, 3:29-33 ("*preferably* along the same optical axis"); 5:33-39 ("a *part* of the optical path *preferably* coincides with the optical axis" which is "*preferably* a straight line"); 27:20-28 (describing "[t]he scanner *embodiment* illustrated in FIG. 1"). It violates black-letter claim construction rules to read specific embodiments into the claims. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1323-27 (Fed. Cir. 2006) (en banc) (limiting the claimed "baffle" to only disclosed embodiments is improper).

**E. "high-speed camera" ('146: cls. 1, 6, 22)**

A POSITA would understand that "high-speed camera" is a term of art, indicating any camera with a high framerate for capturing images faster than a normal camera. Accordingly, Defendants' argument should be rejected since

"high-speed camera" would be well understood by a POSITA and is therefore not a term of degree.

But, even if such objective bounds are required, the parties diverge, over what aspect of a “standard digital camera” should provide the yardstick against which “high-speed” is measured. Defendants’ contention that a “high-speed” camera is defined by its A/D converter architecture is contrary to the language of the claims, the specification, and the knowledge of a POSITA.

Tellingly, when the “minimum conditions” for the high-speed camera are identified in dependent claims, as cited by Defendants, the claims use the camera *framerate*, not the A/D converter design. Def. Br., 12. This is consistent with how a POSITA would understand the term to be based on framerate. Ex. I, ¶¶28-29, 33. This is further consistent with the specification’s disclosure of framerate as an important aspect of 3D scanner design. *See* ’146 Patent, 8:1-8, 11:15-34, 11:66-12:1, 17:53-60 (illustrating framerate is a factor in increasing exposure time and decreasing motion blur and is a core part of the correlation measure algorithm). Further, the passage Defendants cite in support of an A/D converter-based construction itself suggests a framerate-based reading of the term. Specifically, a “standard digital camera” may be used, but “to increase the frame rate [of] the scanner,” the specification recommends a high-speed camera. *Id.*, 8:1-8. Only

then is the specific A/D converter architecture disclosed, as *one potential implementation* of a "high-speed camera." *See id*.

Defendants' construction also limits the definition of "high-speed camera" to a small subset of what a POSITA would consider to be "high-speed" cameras. Defendants' attempt to narrow the claims to one specific embodiment, under the guise of providing "boundaries" for what constitutes "high-speed," is improper because it reads out of the claims cameras that would be considered "high-speed" by a POSITA. Ex. I, ¶¶30-32. Specifically, a POSITA would have understood the class of high-framerate cameras required by the specification to include cameras with column-parallel A/D converters (*i.e.*, cameras incorporating only one A/D converter per line of pixels). *Id*. (discussing image sensors with column-parallel architecture capable of achieving speeds of up to 1000 frames per second.) Because the plain and ordinary meaning of the term is consistent with the disclosure in the specification and with a POSITA's understanding of a "high-speed camera," no construction is needed.

**F. "switching on and off the at least three monochromatic light sources" ('146: cl. 6; '667: cls. 3, 20)**

The dispute between the parties is whether all of the at least three monochromatic light sources must be switched on and off together. 3Shape's proposed construction clarifies that either switching all the light sources off and on

together or a subset thereof is permitted by the claim language.

While claiming to apply the plain and ordinary meaning, Defendants actually seek to narrow the claim to exclude embodiments. Collectively switching *all* of the at least three monochromatic light sources on and off is contradicted by the surrounding claim language, which specifies that "the hardware processor is configured to selectively ***switch the color*** of the probe light by switching on and off the at least three monochromatic light sources." '146 Patent, cl. 6; '667 Patent, cls. 3, 20. If all three monochromatic light sources have to be turned on and off together, the color will always remain constant. *See Paragon Solutions, LLC v. Timex Corp.*, 566 F.3d 1075, 1088 (Fed. Cir. 2009) (refusing to construe "displaying real-time data" as requiring "literally instantaneous [display], because the claims themselves require a transmission that necessarily takes some time").

3Shape's construction—"switching on or off *one or more* of the at least three monochromatic light sources"—reflects the meaning of this claim term because the *color of the probe light* must be switched. Simply turning *all* of the light sources on and off does not "selectively switch the color" of the probe light. *See, e.g., Phillips*, 415 F.3d at 1314 ("the context in which a term is used in the asserted claim can be highly instructive"). The specification confirms the switching on and off is of one or more of the monochromatic light sources (and not

all of them, collectively). *See* '146 Patent, 20:62-64, 21:25-32.

### G. "wherein the probe light is directed towards the object in a direction substantially parallel with the longitudinal axis of the tip" ('146: cl. 8) / [similar language] ('667: cls. 5, 22)

The "substantially parallel" term is not indefinite because a POSITA would understand the scope of the term based on the specification's guidelines and examples; accordingly, it should be given its plain and ordinary meaning.

Defendants' reliance on *Enzo BioChem* is misplaced. Defendants focus on the statement that terms of degree require "some standard for measuring that degree," and entirely ignore the qualifying language that "some standard" can be provided by the specification's "general guideline and examples ***sufficient to enable a person of ordinary skill in the art to determine the scope of the claims***." *Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1332-35 (Fed. Cir. 2010). Here, the specification meets that standard.

Not only does the specification provide "general guidelines" on the path and direction the probe light follows through the scanner, (*see, e.g.*, '146 Patent, 19:13-33, 22:41-47, 23:14-29, 25:48-55), but the figures provide further examples and embodiments showing the path of light. *Id.*, Figs. 2, 6, 8. A POSITA would understand, based on these examples and general guidelines, the scope of "substantially parallel." Ex. D, ¶¶39-40; *see also Verve, LLC v. Crane Cams, Inc.*,

311 F.3d 1116, 1120 (Fed. Cir. 2002) (the relevant question is whether a claim's "scope would be understood by persons in the field of the invention.").

Defendant's argument that the "wherein" phrase renders the claim inoperable is equally unavailing. The plain language of the claim discloses that the probe light travels "in a direction substantially parallel with the longitudinal axis of the tip," before being "further reflected towards the object by a single reflective mirror." '146 Patent, cl. 8. That the probe light may travel along the body of the scanner, generally in the direction of the teeth, before being redirected by a mirror to point directly at the tooth to be scanned, does not render the claim inoperable. The path of the probe light through the scanner would be well-understood by a POSITA, and Defendants' attempts to manufacture inoperability and ambiguity should be ignored. Ex. D, ¶¶39-40. Accordingly, the "substantially parallel" term is definite, and should be given its plain and ordinary meaning.

### H. "data for the 3D geometry" ('146: cls. 12, 24; '667: cls. 8, 15) / "the data for the 3D geometry" ('146: cl. 21)

The meaning of "data for the 3D geometry" is clear from the claims and the specification. While the terms "data for the 3D geometry" and "the data for the 3D geometry" arguably lack proper antecedent basis, the terms are not indefinite because a POSITA would readily understand the meaning of the terms from the claim language, especially when read in light of the specification.

Defendants seek to manufacture ambiguity where there is none by reading into the specification an undisclosed embodiment with two separate data pipelines. This embodiment is a fiction, created exclusively to support Defendants' argument that (contrary to precedent) a minor antecedent basis issue should result in an indefiniteness finding. *Epic Tech, LLC v. Penn-Tech Assocs., Inc.*, Case No. 1:20-cv-02428, 2022 WL 3212728 at *10 (N.D. Ga. Jun. 3, 2022).

The specification describes processing raw 3D data to generate "data for the 3D geometry." *See, e.g.,* '146 Patent, 2:65-3:6, 8:59-9:24, 31:14-35. The only data pipeline described in the specification starts with 2D images that are processed to "extract in-focus information." '146 Patent, 8:59-9:24. This processing step transforms "raw 3D data" into "3D real world coordinates." *Id.*, 8:59-9:24, 2:65-3:6. The claims are consistent with this single data pipeline. *See e.g., id.*, cl. 9 ("wherein the hardware processor is further configured to locally ***process raw 3D data into data for the 3D geometry.***"). Because the claims describe raw 3D data being processed into "data for the 3D geometry," consistent with the disclosure in the specification, there is no ambiguity, and a POSITA would understand the claims to match the embodiment described in the specification. Ex. I, ¶¶42-43. Therefore, all of these claims should be construed to correct antecedent basis informalities.

## III. U.S. PATENT NO. RE48,221

### A. "physical 3D environment" (cls. 1, 19, 33)

Defendants' indefiniteness arguments ignore the actual language of the claims and the understanding of those of skill in the art. Defendants acknowledging that "a POSITA might initially surmise that the 'physical 3D environment' relates to the actual area to be scanned (*e.g.*, the patient's mouth)." Def. Br., 19. This illustrates that the physical 3D environment has a plain and ordinary meaning and is not ambiguous. It is exactly as explained in the 3Shape opening brief: the "physical 3D environment" is the environment in which the scanner operates. The "3D environment"—which Defendants rely upon in an attempt to inject ambiguity—is the portion of the "physical 3D environment" that is scanned and displayed. The specification sections Defendants cite support this distinction. *See* '146 Patent, 2:10-13, 8:52-60, 10:25-26 (illustrating the "physical 3D environment" is the physical location where scanning occurs and "3D environment" is what is scanned and displayed).

This plain and ordinary meaning is further supported by the parties' agreed upon construction of "3D environment:" "[a] constellation of physical objects each having a 3D geometry in *a three-dimensional space*." *See* Def. Br., 5. The *three-dimensional space* in which the constellation of physical objects exists is the

"physical 3D environment" claimed. Contrary to Defendants' assertion, other claim recitations of a display "adapted for visually representing the physical 3D environment" does not contradict this meaning. The display is adapted *for* representing the "physical 3D environment." The portion of the "physical 3D environment" actually represented on the display is the portion actually scanned (the "3D environment").

Defendants have not met their heavy burden of proving that the claims of the '221 Patent are indefinite. *Microsoft Corp. v. i4i Ltd. P'ship*, 564 US 91, 95 (2011) (party challenging patent must prove invalidity by clear and convincing evidence). The "physical 3D environment" is not indefinite and no further construction is necessary.

### B. "wherein the at least one motion sensor is a sensor that directly detects motion" (cls. 1, 19)

Defendants attempt to manufacture ambiguity where this is none. The plain language of the claims calls for a sensor to "directly" detect motion. Defendants' argument is that "directly" is a term of degree like "elongated" or "fragile." Def. Br., 22. This argument makes no sense. Nothing in "direct" indicates degrees or shades of grey. Rather, this is a term that specifies the manner in which motion must be detected: directly, instead of indirectly. *See, e.g.*, *3M Co. v. Kerr Corp.*, No. 17-1730-LPS, 2019 WL 2411736 at * 3 (D. Del. June 7, 2019) (Stark, J.)

(finding "fully densified" not term of degree because it is "binary."); *FloodBreak, LLC v. Art Metal Industries, LLC*, No. 3:18-cv-503, 2020 WL 45458084 at *14 (D. Conn. Aug. 6, 2020) (finding "not obstructing" is not term of degree). Defendants' indefiniteness arguments therefore fail.

Defendants are also wrong that the claims and specification provide no clarity on the meaning of "directly." First, Defendants' claims that the term "directly" must be used verbatim in the specification is contrary to established precedent. *See, e.g., Blue Calypso, LLC v. Groupon, Inc.*, 815 F.3d 1331, 1345 (Fed. Cir. 2016). Defendants recognize that the specification has met this standard, explaining "the specification again provides examples of motion sensors, such as accelerometers, gyros, and magnetometers (which detect rotations, lateral motion and/or combined rotation)."

Defendants' arguments relying on dependent claims 8 and 20 (Def. Br., 22-23) confirm, rather than refute, this understanding. The reexamination certificate (showing changes relative to the '675 Patent claims) shows claim 8:

> **8**. The *scanning* system according to claim **[**4**]** *1*, wherein the **[**user-interface is other than the at least one motion sensor**]** *handheld device further comprises at least one of an infrared sensor, a range sensor, or a proximity sensor.*

Claim 8 thus adds an additional recitation to the scanning system of claim 1 that the handheld device *further comprises* at least one of these three types of sensors.

Claim 8 does *not* recite, as Defendants seem to allege, that the motion sensor *is* one of these three sensors. Rather, claim 8 requires: (i) a motion sensor that directly detects motion; and (ii) at least one *additional* sensor. Claim 8 further confirms the distinction between motion sensors that <u>directly detect</u> motion and sensors that may not necessarily directly detect motion, such as infrared, range, or proximity sensors.

Claim 20 makes this distinction even more apparent. Claim 20 recites "the at least one motion sensor ***is*** an accelerometer, gyro, or magnetometer." Claim 20 thus enumerates three specific known motion sensors; *i.e.*, an accelerometer which detects acceleration (relative change in linear position), a gyro which detects relative change in orientation, and a magnetometer which detects relative change in gravitational field. Ex. I, ¶¶46-47. A POSITA would recognize these particular sensors as the three most common motion sensors. *Id.*, ¶¶44-45. The detection of *relative* position or orientation changes—as opposed to merely detecting an absolute value, such as position, and being able to indirectly derive motion—is exactly the failed argument from the '675 Patent (the direct predecessor of the '221 Patent) IPR that led to this recitation of "directly" detecting motion introduced in reexamination. *See, e.g.*, Ex. B, 25-28 (arguing alleged prior art "Serra's tracking system detects ***absolute values***, whereas ***the motion sensor*** of the '675 Patent

***detects relative values***"); Ex. C, 4-8 (showing the claims filed immediately after '675 Patent invalidity). Defendants have not shown by clear and convincing evidence this term is indefinite.

## IV. U.S. PATENT NO. 10,695,151

### A. "shape data" (cls. 1, 13, 14) / "texture data" (cls. 1-3, 7, 10, 13-15)

The terms "shape," "texture," and "data" are commonly used terms, used consistent with their normal definitions in the specification and claims. There is no "express definition" in the specification as alleged by Defendants. Def. Br., 24. Rather, the specification provides explanatory language about shape and texture data in relation to the digital 3D representation. *See* '151 Patent, 2:32-54. Accordingly, there is no need for a construction, let alone Defendants', which merely rearranges the plain claim language and does not provide any further insight regarding the meaning of the term.

Defendants also claim that a construction is necessary to "eliminate ambiguity by specifying that the data relates to the [shape or texture] 'of the tooth.'" Def. Br., 24. But, as 3Shape explained in its opening brief, the claim already does this, stating, "where the digital 3D representation comprises shape data and texture data *for the tooth*." '151 Patent, cls. 1, 13, 14. Claim construction "is not an obligatory exercise in redundancy;" rather, it "is a matter

of resolution of disputed meanings and technical scope, to clarify and *when necessary* to explain what the patentee covered by the claims." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008). As Defendants merely seek to reword the claims, construction is improper. *Kason Inds., Inc. v. Component Hardware, Grp., Inc.*, No. 3:13-cv-00012, 2014 WL 10588312 at *5 (N.D. Ga. Jan. 31, 2014) ("the Court need not provide a new definition or rewrite a term when the Court finds the term's plain and ordinary meaning is sufficient") (internal quotation omitted).

**B. "deriving a certainty score" (claim 1)**

Defendants wrongly claim that *Straight Path IP Group v. Sipnet EU S.R.O.* stands for the proposition that "where … the *claim language* provides a definition, there is no 'basis for reasonably adopting a construction that contradicts the plain meaning.'" Def. Br., 25 (citing 806 F.3d 1356, 1361 (Fed. Cir. 2015). What *Straight Path* actually says is "[h]ere, *the specification does not provide a* basis for reasonably adopting a construction that contradicts the plain meaning." 806 F.3d at 1361 (also applying the broadest reasonable standard not applicable here).

Defendants then wrongly conclude that because the specification defines "certainty score," no construction is necessary. Def. Br., 24-26. That is not the standard. Unlike the commonly used terms like shape, texture, and data,

discussed above, "deriving a certainty score" is not a term generally used by those skilled in the art. Defendants do not claim they are and, moreover, fail to state what the "plain and ordinary meaning" supposedly is. *See generally* Def. Br., 10-12; *see also Mobile Telecomms. Techs., LLC v. United Parcel Service, Inc.*, No. 12-cv-3222, 2014 WL 1274003 at *6 (N.D. Ga. Mar. 17, 2014) (simply arguing the ordinary meaning applies "does not necessarily mean that the Court should not supply to the jury such an ordinary meaning") (internal citation omitted).

3Shape's construction should be adopted because it clarifies the scope and meaning of the term and will therefore be of more assistance to the jury. 3Shape's proposed construction provides information on what the "certainty score" is – an "accuracy value" – and specifies from what information it is "derived" – "determin[ed] … based on the tooth shade value, the texture data, and/or the texture information." In claiming that 3Shape's proposed construction "merely replaces the claim language with a similar phrase that does not improve comprehension" (Def. Br., 25-26), Defendants entirely ignore the part of 3Shape's construction that describes the sources from which the value is derived – *i.e.*, the tooth shade value, the texture data, and/or texture information.

Therefore, 3Shape's construction should be adopted.

### C. Antecedent Basis Terms

Defendants nitpick the improper use of "the" when it is apparent that these terms merely should have been drafted to introduce the terms for the first time. Defendants' assertions of ambiguity are undercut by their IPR petition, which asserts: (i) no construction is necessary for any of these terms; and (ii) all of these features can be readily mapped to purported corresponding aspects in other references. *See* Ex. L, 2-3, 6-8. It is improper to construe the terms one way for invalidity and another for infringement. *Data Engine Techs. LLC v. Google LLC*, 10 F.4th 1375, 1381 (Fed. Cir. 2021).

Despite Defendants' attempt to manufacture ambiguity over formal antecedent basis, they acknowledge that the surrounding claim language and specification makes the meaning of the claim terms clear. In discussing "the certainty measure," Defendants undermine their own position by acknowledging that the specification defines "certainty measure" and that that definition is consistent with how the term is used in claim 7. Def. Br., 27. Defendants are correct that the specification explains that the "certainty measure relates to how uniform the sub-scan texture information is at the point." *Id.* (citing '151 Patent, 6:25-27, 7:7-8). That is consistent with what claim 7 says: "wherein the certainty measure relates to how uniform the sub-scan texture information is at the point and/or to how close the texture data is to the known texture value." '151 Patent, cl.

7. Defendants offer conclusory arguments that because "the certainty measure" is not interchangeable with the "certainty score," it must be ambiguous. Def. Br., 27. But the point of dependent claims is to narrow the independent claims. "Certainty measure" as used in claim 7 narrows "certainty score" by specifying that it "relates to how uniform the sub-scan texture is at that point."[3]

Defendants' reliance on *Haliburton Energy Servs. v. M-I. LLC*, is also misplaced. 514 F.3d 1244, 1256 (Fed. Cir. 2008). Contrary to Defendants' assertion, the *Haliburton* holding is ***not related to antecedent basis issues***. Instead, it considers the term "fragile gel" where none of the three definitions proposed by the patentee provided boundaries with which a POSITA could distinguish the term from the prior art or ascertain the "fragile gel's" properties. *Id.* *Haliburton's* only discussion related to antecedent basis is a general statement that a claim can be indefinite for lack of antecedent basis "where such basis is not *otherwise present by implication* or the meaning is not *readily ascertainable*." *Id.* at 1249. Defendants' brief acknowledges that both are present here. Def. Br., 27.

Defendants' arguments regarding "the sub-scan texture information" and

---

[3] While Defendants consistently cite expert testimony to support their positions, the expert reports submitted add little substantive evidence. Specifically, both expert declarations appear to be mainly repackaged attorney argument and should be given no weight.

"the amount of information" similarly fall flat. *Haliburton* is again inapt as it has nothing to do with the antecedent basis issues here. Defendants bear the burden of proving indefiniteness by clear and convincing evidence. *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1365 (Fed. Cir. 2017). They cannot meet that burden with conclusory statements that it is unclear what "the sub-scan texture information" and "the amount of texture information" refer to. Def. Br., 28; *Williamson v. Google*, No. 15-cv-00966, 2017 WL 3232582 at *10 (N.D. Cal. July 27, 2017) (conclusory assertions that a term is unclear are insufficient to prove indefiniteness).

Finally, claim 11 must be interpreted in the context of its dependence from claim 1. "The texture information" refers to claim 1's disclosed "texture data." Defendants' assertion that the two terms have different meanings in the specification is unavailing because the relevant standard is whether a POSITA would have reasonably understood the claim, not whether a POSITA could have come up with a distinct meaning that, if adopted, would render the claim indefinite.

## V. CONCLUSION

For the reasons stated above, and in 3Shape's Opening Claim Construction Brief, the Court should adopt Plaintiff's positions.

Date: February 16, 2023

Respectfully submitted,

*/s/ Puja Patel Lea*

Puja Patel Lea
Puja.Lea@troutman.com
TROUTMAN PEPPER HAMILTON SANDERS LLP
600 Peachtree Street N.E.
Suite 3000
Atlanta, GA 30308
Tel: 404.885.3838

***Counsel for Plaintiff 3Shape A/S***

Kimberly Coghill (*pro hac vice*)
Kimberly.Coghill@Troutman.com
Bryan J. Cannon (*pro hac vice*)
Bryan.Cannon@Troutman.com
TROUTMAN PEPPER HAMILTON SANDERS LLP
401 9th Street, N. W.
Suite 1000
Washington, D.C. 20004
Tel: 202.220.1200
Fax: 202.220.1465

William Belanger (*pro hac vice*)
William.Belanger@Troutman.com
Gregory Len (*pro hac vice*)
Gregory.Len@Troutman.com
Frank D. Liu (*pro hac vice*)
Frank.Liu@Troutman.com
Ana Spone (*pro hac vice*)
Ana.Spone@Troutman.com
TROUTMAN PEPPER HAMILTON SANDERS LLP
125 High Street, 19th Floor High Street Tower Boston, Massachusetts 02110-2736
Tel: 617.204.5100
Fax: 617.204.5150

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rule 7.1(D), the foregoing complies with the font and point selection approved by this Court in Local Rule 5.1 (B). This paper was prepared on a computer using Times New Roman fourteen-point font, double-spaced.

*/s/ Puja Patel Lea*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**

| | |
|---|---|
| 3SHAPE A/S,<br>Plaintiff,<br>v.<br>CARESTREAM DENTAL, LLC, DENTAL IMAGING TECHNOLOGIES CORP., and DENTAL IMAGING TECHNOLOGIES CORP. d/b/a DEXIS<br>Defendants. | Civil Action No. 1:22-cv-01829-WMR |

**CERTIFICATE OF SERVICE**

I hereby certify on this 16th day of February, 2023, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF System, which will send a notification of such filing (NEFF) to all counsel of record.

/s/ Puja Patel Lea